# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Lois Ann Gibson, a Private Citizen/Voter | ) | |
| Frederick, Maryland; | ) | |
| C/O. Counsel P.O. Box 370 | ) | |
| Woodsboro, Maryland 21798 | ) | |
|     And | ) | Case No. |
| Maryland 20-20 Watch, a Private Unincorporated | ) | |
| Association of Maryland Citizens and Voters, in Md., | ) | |
| by Chairman, Lewis T. Porter, Investigator/Voter | ) | |
| C.O. Post Office Box 370, Woodsboro, Md. 21798 | ) | |
|     And | ) | |
| Amicus Curiae, Charlton Scientific Educational and | ) | |
| Engineering Foundation, Inc. ; | ) | |
|     And | ) | |
| A committee of injured citizen/voters for | ) | |
| themselves and all others similarly situated pursuant | ) | |
| to Federal Rule of Civil Procedure Rule 23, and the | ) | |
| Federal Rules of Civil Procedure, Multi-District | ) | |
| Litigation Sections, Consisting of  a: | ) | |
|     Putative Class of similarly situated Voters of | ) | |
| of Maryland who are Similarly Situated, and denied | ) | |
| or superseded in their vote, and/or Right to Vote, | ) | |
| and/or Injured by Abrogation of His/Her Voting Power | ) | |
| and/or Constitutional Right to a Fair and Honest Vote, | ) | |
| and/or Shall be Immediately and Irreparably Harmed | ) | |
| and/or Likely Injured by the Continuing Ongoing | ) | |
| Frauds described herein specified and/or specifically | ) | |
| detailed herein | ) | |
|     And | ) | |
| Any, presently unknown State Agency which was | ) | |
| Duped by the Multiple Frauds Alleged herein | ) | |
|     And | ) | |
| All others similarly situated injured persons, in | ) | |
| whatever state or County they reside, in this | ) | |
| RICO Multi-District Litigation for False Vote | ) | |
| Tabulation; Deceased and Moved Roll harvesting, | ) | |
| Conspiracy; for Money Laundering and for False Vote | ) | |
| Bribery; Totaling or Tabulation Manipulation with | ) | |

Causing Immediate and Irreparable harm to )
Government Credibility, Confidence in Present )
and Future Elections by Placing False Financial )
Information into State or Federal Financial Records )
and/or Voting Rolls. )
)
**<u>PLAINTIFFS</u>** )
)
V. )
)
Frederick County Maryland, )
     And )
Howard County, Maryland, )
     And )
Carroll County, Maryland )
)
    Additional Defendants: )
)
   18 additional counties alleged to participate )
in the fraudulent procedures, receiving bribery )
and unlawful influencing by compromised "Grants" )
to  Maryland Vote Workers of tax free funds, these are:)
)
    Allegheny, Anne Arundel, Baltimore City, )
Baltimore County, Calvert, Caroline, Cecil, Charles, )
Dorchester, Garret, Harford, Howard, Kent County )
Board of Elections, Montgomery, Prince Georges, )
Queen Anne's, Talbot, Washington, Wicomico; )
     And; )
A RICO Enterprise, Containing the State of Maryland, )
and Other States Utilizing Unlawful Conspiracies )
and/or Methodology to Rig Votes, et al: )
     And/or )
Each unlawfully acting citizen, or RICO Entity, or )
Federal or State Government Employee, with the sole )
exception of those protected by Government Immunity )
Acting with guilty knowledge of the fraudulent facts )
nevertheless, intentionally, or by a conspiracy to alter, )
individually, to place false or knowingly, incorrect, )
or to render false, forge or utter, or merely or destroy )

materials from the voting process or accountability )
records, or to falsely pay others to falsify or do so )
alone, or in conspiracy with others, thereby aiding and )
abetting the unlawful violations of any citizen's voting )
rights in any state or jurisdiction, by aiding and )
knowingly or negligently, thereby abetting paying for )
or underwriting the fraudulent voting means, systems )
delivery of fraudulent materials or activities, with )
guilty knowledge thereof; of such practice or act; )

    And; )

a class of Similarly Situated Defendants who are now )
known to have accepted alleged "Grant" Money from )
CTCL, and thereafter used such funds for unlawful )
purposes to influence election results and continue to )
utilize such unlawful means in the future, and/or )
whom presently intend do so in the Future, or )
Alternatively have aided and abetted the Fraud, both )
Civil and Criminal and/or found to have occurred, )
now or in Future Election(s) On a Continuing Basis; )
  )

And further; those classes or Classes of Defendants )
similarly situated in Other Districts Similarly Situated )
Utilizing Similar Fraudulent Schemes in Other States; )
and or the District of Columbia, or Judicial District )
further, Each and Every Election Executive Or )
Worker who, with Knowledge of the Unlawful Nature )
of their Own Acts has aided and abetted the creation or )
carrying out of the damages to this Country and each )
part thereof by the perpetration of the Unlawful Acts )
described herein and shall be convicted of such )
Acts in Accordance with the Laws of the United States )
or the Laws of Maryland or the respective States )
wherein such Unlawful Acts Occurred. )
  )

**Defendants.** )
    And )
Center for Tech and Civic Life (CTCL) )
233 N Michigan Ave., Suite 1800 )
Chicago, Il. 60601; )
    And; )

Presently Unknown Defendants, expected to be    )
identified as both government employees, or private  )
persons identified from documents received from   )
government sources, including non-profit foundations  )
in Fact RICO Enterprises, numbering in the many   )
dozens, Foreign and Domestic, who, by good and   )
verified admissions and verified evidence, or at trial  )
shall be demonstrated to have conspired and/or be  )
found to have or currently are conducting Civil or   )
Criminal Process of Law, to have participated and/or  )
knowingly Aided and Abetted the Activities     )
Complained of herein; have thereby violated the civil  )
and Criminal Laws of the Constitution of the State of  )
Maryland and/or the United States of America,    )
including without limitation, the RICO Act and/or   )
The False Claims Act, wherein each such statute is   )
applicable:                     )
        And;               )
The State of Maryland, Through its Departments   )
        And:               )
The Office of the State Prosecutor, who has     )
Abrogated its Office by failing to Stamp Out RICO   )
Enterprises in its Jurisdiction, for Whatever Reason.  )
                         )

        **DEFENDANTS**        )
                         )

# COMPLAINT

**FOR VOTE FRAUD,
CREATION OF A RICO ENTITY, A STATE AND
NATIONAL CONSPIRACY PARTICIPATED IN BY NAMED
DEFENDANTS, AND UNKNOWN OTHERS, TO COMMIT
VOTE FRAUD IN A NATIONAL ELECTION VIOLATION
OF 6 U.S.C. § 451[1]**

**FOR EMERGENCY, TEMPORARY, <u>PRELIMINARY,
AND PERMANENT INJUNCTIVE AND OTHER
EQUITABLE RELIEF</u>**

---

[1]Section 5, "The EISCC operates under the critical infrastructure partnership advisory council (CIPAC) framework established by the Secretary of Homeland Security pursuant to section 871 of the Homeland Security Act of 2002 (6 U.S.C. §451)"

**(Part one- Setting, Jurisdiction, Law, and Conclusions, for Details of Facts See Part Two, following, page 38, for a Draft Temporary Restraining Order, See Attachment A, For Index of Exhibits, See Page 61, following Complaint. )**

**I.  VOTE FRAUD – RICO CONSPIRACY, WITH IMMEDIATE AND IRREPARABLE HARM – DANGER OF DESTRUCTION OF RECORDS, FOR AN IMMEDIATE PROTECTIVE ORDER,**
**AND**
**CONSTITUTIONAL CORRECTIVE ACTION FOR A REMEDY IN THIS STATE AND**
**OTHER EQUITABLE RELIEF, TO CORRECT A CORRUPTED NON-FUNCTIONAL, INSUFFICIENT EVIDENCE AND CUSTODY CONTROLS OF A CORRUPTED VOTING AND RECORD KEEPING SYSTEMS, DENYING ALL CITIZENS THEIR CONSTITUTIONAL RIGHTS FOR NOW AND IN THE FUTURE;**
**BY ACTION OF THE COURT SYSTEM AS IS ITS CONSTITUTIONAL DUTY :**

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

<u>**PRELIMINARY STATEMENT**</u>

There has been an overwhelming response from Whistle Blowers and Concerned Citizens of Counties throughout Maryland, and elsewhere, of Obvious and Determinative Fraud in Voting in Maryland and Nationally, in the 2020 Federal Elections; this Complaint attempts to Invoke the Power of this Court to Correct those Harms which Threatens the Survivability of Our Great Nation :

A similar pattern and practice of unlawful activities has been noted and cataloged all across the Country. This complaint focuses on Maryland, initially in three Counties, but with striking similarities noted in 21 of 24 jurisdictions. Three jurisdictions/ Counties, did not participate in the specific frauds investigated and alleged herein.

## <u>EVIDENCE</u>

This complaint is supported by a large sample of documents furnished by one Maryland County, which is expected to be representative of all 21 Counties in Maryland receiving the $ 6,245,797 in Grants [2].

Howard County Maryland furnished a list of 861 checks which purport to be the money spent by Howard County which was received from a Grant from CTCL. The total of the 861 separate payments in dollars is exactly the same number as the

---

[2] Exhibit #1, with details supplementing follow on succeeding pages, after page 61. An index of Attachments and Exhibits is page 61,

reported Grant total, $ 688,226[3].

The names on the payments list as reported by the County were sorted alphabetically.  About 760 names appear, with some duplicate names.  Research disclosed that the top three earners were from the same family.  Each was paid over $ 11,000, and received exactly the same amount in their, final paycheck, $2,940.19.  Again, as reported by the County, the entire amount of the Grant was paid out to these about 760 people.

And the amount of the total payments matches exactly the amount of the Grant, $ 688,226.  Plaintiffs infer from this information, here are the Mules, subject to further documentary proof.

Plaintiffs allege, based upon the eyewitness reports from other Counties, that a significant number of these 760 Cash recipients were in fact the "Mules"[4] who also, in fact created and/or delivered the fake and duplicate election ballots observed by two other witnesses who presently choose to remain anonymous.  Incontrovertible proof of this allegation is expected to result from a small number of 30(b)(6) depositions, with

---

[3] Howard County refused to produce its Contract with CTCL.  Carroll County refused to produce its disbursements of Grant Money received from CTCL. All three Counties are expected to be deposed as to details of all of this evidence which is expected to produce a uniform pattern of abuses consistent with all of the other 21 Counties of Maryland investigated.

[4] "Mules" describe persons who transport drugs, or in this instance, fake or fabricated or otherwise fraudulent ballots foisted upon honest poll-watchers by unscrupulous persons. Recently this unlawful practice received substantial alternative media attention in the documentary, "2000 Mules".

See also the Arizona, Maricopa County Audit interim report of Jovan H. Pulitzer, released on or about June 28th, 2022.  Maricopa County is in the south-central part of the U.S. state of Arizona. As of the 2020 census, the county's population was 4,420,568,

subpoenas, to acquire for the deposition the supporting detailed documents.

Also, very recently the methodology of cheating on the drop-box and mail-in practices have been exposed by two related sets of documentary exposures.  On information and belief, these fraudulent practices were in use Nationwide from at least 2016 to date.  This allegation places these practices into the Jurisdiction of a Federal RICO Claim almost standing alone.

This lawsuit expects to draw from both of those related factual large volume efforts for use by experts witnesses to be selected within the period of effectiveness of the requested Temporary Restraining Order.  These efforts, now becoming standard practice for exposures of drop-box and other election frauds in falsification of ballots are the Arizona Audit, report of Jovan Pulitzer, who has agreed to participate in this effort, hopefully as an expert witness.  Also, considered is the slightly different approach of the 2000 Mules Documentary.  Both of these recent presentations contain factual matters believed to be relevant, or identical, to the practices addressed in this Complaint.

### THE TEMPORARY RESTRAINING ORDER

Plaintiffs request a temporary restraining order to protect all such related documents from destruction; and permission to immediately conduct several depositions pursuant to F. R. Civ. P. Rule 30(b)(6).  The existing substantial sample of evidence is expected to be expanded in detail and geographic scope, in time for a full presentation at

the preliminary injunction hearing.  And of course further expanded as necessary for trial

as needed for the multi-district nature of this litigation.

This is the thrust of this complaint.

### Jurisdiction and Venue - Maryland and Nationwide

Analysis by investigators and counsel began many years ago in Maryland.

Anecdotal evidence has been gathered to present to the Court a fair and well-balanced

overview.

It has become obvious that this situation is not simply a local concern, it is

nationwide. It may vary in practice and severity from place to place, even within

individual states. In Maryland, three Counties have been sampled, presenting in detail a

bleak but similar initial picture.  Those Counties are Frederick, Howard and Carroll.

However, by stepping back and taking an overview of the State as a whole, a pattern

emerges which is shocking in dishonest uniformity.

### II.   STATEMENT OF FACTS:

1. This case is not about Donald Trump or the 2020 election. Rather, it is

about correcting the existing election system to ensure election integrity for all citizens in

the future.

2. This case is also about examining the honest system deficiencies, frauds,

manipulations and loss of election integrity of the past election, all destined to be repeated

in the future.  The repeat is inevitable through a lack of systemic and monetary controls

noted, including past cycle's violations of Federal and State law.

      3.  All of the above summary facts are incorporated into this Statement of

Facts as if fully set forth herein as to the appropriateness of Multi-District litigation by the

Federal Court system, as the only constitutional entity with jurisdiction over all of the

unconstitutional and likely treasonous matters alleged herein, and even thos matters yet to

be addressed and after discovered.

      4. But, this RICO case also involves the overarching conspiracies of a

number of people in a number of roles, creating "the presence of fraud" throughout the

election system, and likely all aspects of our government and private enterprises.

      5.  Cash grants to 21 Counties and Baltimore City, $ 6,245,797 total)[5] were

used for unlawful and/or misstated purposes different from reported and contracted

reasons.  The actual payments to election workers were  tailored to impact election

results.  For example placing false ballots into the voting drop-boxes.

      6.  On information and belief, at least hundreds of millions of dollars has

been distributed to elements of the RICO Enterprise(es) since the beginning of the

practices described herein, likely even before the election of 2016.

      7.  In the hearing for the Preliminary Injunction for this case, evidence

---

   [5]  Exhibit #1, Source of Information, Capital Research. Org, M-20-Go/TV-CEIR-Report/PDF; also, this public information gathered and maintained in IRS records, pertaining to Tax Exempt Charities.  (IRS Code Section 501(c)(3)).

obtained by subpoenas is expected to further detail obvious misuse of Grant proceeds, to demonstrate biased, and likely unlawful payments for vote harvesting and delivery to drop-boxes.

8. Substantial evidence in the form of financial records was obtained in State PIA request responses.  The samples disclose misinformation pertaining to the Grant Process, misreporting of monies spent, and likely misuse of the monies spent for election influencing acts.

9.  During the period of time from the filing of this Complaint, until the hearing on the Preliminary Injunction, Plaintiffs intend to use the subpoena process to each county to obtain evidence pertaining to the grants received, the strictures of the election law and the magnitude of the known violations for each of the 21 Counties listed on Exhibit #1 hereto.

10.  The Temporary Restraining Order requests:

a.  A Stay of evidence destruction, a continuation of Federal Election law, contained in 52 U.S.C. § 20,701, indefinitely, for the District of Maryland, and also;

b. to be seriously considered for all other Districts in the Federal Judicial System, first as a TRO, and thereafter as Preliminary and Permanent Injunctions.

11.  Permission, immediately after service of process, to allow Plaintiffs to conduct at least three, F. R. Civ. P. 30(b)(6) depositions, along with the issuance of subpoenas regarding grant data and spending purposes.  Thereby, the partial evidence of

fraudulent activities pertaining to the three examined Counties, Frederick, Caroll, and Howard, shall be supplemented and used in the scheduled Hearing on the Requested Preliminary Injunction (about two weeks hence).

12.  Based upon the patterns already discovered, it is expected that documentary evidence will be consistent across the board of biased spending designed for influencing election results, and cover-up of financial reporting of prohibited practices.

13. Exhibit #2 .1 is a sworn declaration of Ms Gibson, an  Eye Witness to Drop-Box stuffing, is expected to be amplified *prior to* the conducting of the Preliminary Injunction hearing by questioning the Howard County election workers who were paid with Grant  funds from Chicago.

A supplemental investigation utilizing previously obtained documents regarding Grants and uses of Grant Funds is expected to demonstrate incontrovertible proof of unlawful payment for drop box stuffing witnessed by a number of witnesses. Such evidence will be obtained by the subpoena process acting immediately after filing the complaint, and amplified by depositions incident to Federal Rule of Civil Procedure 30(b)(6).

14.  Specific attention will focused upon uses of the grant funds which do not comport with agreed uses under the terms of written Grant contracts.

15. The three jurisdictions already focused upon for review, will be further detailed to specify and identify votes cast,, or collected by persons who received the Grant

funds, contrary to the terms of the grant.

16.   Those jurisdictions shall be further subjected to gathering of evidence for the Preliminary Injunction hearing, and supplemented by such further analysis for systemic failures similarly noted in the other 18 counties as well.  But none of this analysis shall be possible unless the evidence is preserved during this collection process as authorized by Federal Law and subpoena power.

17. In sum, this case is about the impact on our nation of the on-going systemic failures of election integrity from a number of related hidden unlawful sources by co-conspirators, coupled with;

18. A lack of proper accounting for votes, chain of custody over valid votes, and the possible fabrication of false votes, sometimes known as "unlawful ballot harvesting".  The sum of all of these matters may be referred to as a lack of numeric control and governance over the election system and votes.

19. The impending deadline for the destruction of election data is September 3, 2022.  Destruction of that election evidence, on information and belief, now ongoing, contrary to 2, U.S.C. § 209,701 will be further specified and reported for ongoing systemic corrections.

20. To the extent such destruction of evidence continues to occur, or the deadline arrives before protection occurs further immediate and irreparable harm will result.  That destruction will create the loss of invaluable evidence necessary to

understand the magnitude and means by which the eyewitness results did in fact occur.

21. These corrections are necessary to restore election integrity going forward and ensure the continuation of the American dream, its freedoms for its citizens and the preservation of the value of a singular vote.

### III.  CONCLUSIONS OF FACT:

In Maryland, 21 out of 24 voting jurisdictions accepted "Grant Funds" from a Chicago-based, tax exempt charity.  Those 21 Counties and Baltimore, received the total amount of $6,245,797.  By separate grant contract documents for each county, specified categories of purportedly non-partisan "election aid" were specified and agreed upon in each separate jurisdiction's documents (See examples, Exhibit #4).

Frederick, Carroll, and Howard Counties were selected for examination as to Election financing and voting controls applicable therein.  It appears from documents received (Exhibit "#4), contracts substantially identical in format and content, limit the use of funds to specific mandatory uses which must be reported back to the grantor, or refunded back to the Grantor.  No example of a "Grant Refund" has been disclosed.

Accordingly, on information and belief, based upon this sample, the methodology for all recipients of funds in the identified 21 Counties and Baltimore City, is substantially identical.   Each voting jurisdiction signed a contract, accepted funds, and agreed by written contract to accept the written conditions imposed by the Grantor.

But follow-up disclosures as to the actual usage of the funds received

present a totally different and darker story.

A de facto unlawful coercive system exists, based on information gleaned from publicly available records for the three counties reviewed.  Therefore, such de facto violations of election and RICO law are  herein alleged to be now and previously operative in an identical and/or similar fashion in all 21 jurisdictions listed in Exhibit #1.

The same grantor furnished the funds for all 21 Counties, (and elsewhere nationwide) apparently using the same boiler-plate Grant and Contract instruments.  By acquiring these documents, and financial and contract analysis, plaintiffs have developed a substantial picture of the methodology of how the voter's system was gamed in Maryland.

The non-existence of any effective voting control system, particularly over drop-boxes, appears to be a large source of false and harvested ballots.  Nevertheless, the links to the outside money has been traced, in the three Counties examined, by "Following the Money".  Please refer to Exhibit #1 for the distribution of approximately $6.2 million to the 21 counties choosing to participate.  Even without using the subpoena process to date, it substantial systemic deficiencies appear.

Grant funds are alleged to have been used to pay persons, and those persons were used to "harvest" votes.  Then, in large numbers, it appears that the persons paid with the Grant funds (for example 1 for 1 match, to the penny, in Howard County, were for $ 688,226.

The duties performed are not specified, and the contract for Howard County was not furnished for comparison.  Howard County refused to disclose the subject grant contract, but the dollar amount matches exactly the dollar total of the list of purported"election workers" identified.  The duties identified in the grant may be inferred as activities relating to or promoting ballot harvesting for several reasons.

First, Howard County did not furnish the requested Contract known to exist with CTCL as apparently was the standard procedure.  A 30(b)(6) deposition for knowledgeable persons to explain these inconsistencies, and the recipients of the $ 688,000 of funds by this County shall be a good start toward unraveling what actually occurred.  (To this end, see Exhibits 4 and 5).

Exhibit #4 is the consistent contract methodology for all Grants, and Exhibit 5 is the result to be expected, to a greater or lesser extent in each grant receiving County, or Baltimore City.

Second,  because the dollar amounts of the worker payments exactly matched the total grant amount, $ 688,226, one or more of these exhibits must contain errors.  It is expected based upon virtual impossibility that one or both of these reports were forced into agreement before reporting.

Third,  The highest paid three workers, apparently from the same family, each received the same exact large amount. The great bulk of the fees paid were in round dollar amounts.

-11-

Fourth, the listing of amounts paid by worker's names were nearly all paid in round dollar amounts.  This is clear evidence that the Grant was of the fee was for piece-work services for example the rumored 5 or 10 dollars each for ballot delivery, and not based on hours wages worked, subject to wage withholding and taxes.  In any event, the depositions will tell the tale, and a truthful one at that.

This pattern of circumstantial evidence, shall be verified prior to the hearing on the preliminary injunction, strongly indicates that workers were in fact paid a piece rate for something.  Informal reports which shall be verified by depositions prior to the hearing, are to the effect that the harvesters were paid a flat dollar amount, at $ 5.00 per ballot placed into the drop-boxes.

Accordingly, on information and belief, plaintiffs allege this was the pattern in the 21 Counties accepting Grant funds including the three counties analyzed.

On information and belief, it is further alleged that this was the conspiratorial "deal" with the Grantor prior to the issuance of the grant.  This allegation is rendered nearly indefensible because no part of any Grant has been identified as refunded to the Grantor, as per that specific provision of the Grant Contracts.  (Exhibit # 4, pg. 2, #3 of the standard grant form (Same reference for both Frederick and Carroll Counties)).

The exact matching dollar totals of the over 800 payments to workers in Howard County, totaling the same, $ 688, 226, appears to match.  This is an amazing coincidence.  The exact amount of the "Grant" for specific duties, match the exact list of

the persons, that is all of the Grant was to pay people.  And also because the left over
dollars in the Grant, the profits (or unspent funds to that point), appears to have been
split-up, 1/3/ each, and distributed evenly to the three top earners of the operation as a
payoff for completing the tasks and fulfilling the "grant".  The 30 (b)(6) of the County
cash disbursement supervisor on this subject is expected to be very enlightening.

This is not the accusation of a theft of grant funds at this point, but it
certainly has some of the hallmarks of that act.

## Drop-Box Stuffing

The Honorable Court will please refer to Declaration of Lois Ann Gibson,
Exhibit # 2-1)., an apparent unlawful conspiracy, again throughout Maryland to place
false, harvested and/or fabricated ballots into drop boxes has been observed.  The actual
drops have been observed and reported.  Two additional Frederick County residents that
wish to remain anonymous, at this time have submitted (Affidavit, Exhibit # 2-2) relating
another instance of Ballot stuffing, and (Declaration # 2-3), relating to a Frederick poll
worker whose complaints were admitted to be true at an open meeting of the election
board, that count controls over documents for drop-boxes were non-existent).

Declaration of Mr. Kurtis S. Kolb, (Exhibit # 3) is a recent development of
apparent harvesting of voters records where a departing voter had moved to Florida from
Carroll County, Maryland.  His voter's record was undeleted by a forgery utilizing the
*ERIC system* resulting in an extra voter's record, available in the next election.  The voter

disclosed the forgery to the authorities in Carroll County and it is presently being investigated as an identity theft.  This is included herein as a indicator that such matters are currently on-going and potentially just more of the same if this entire control of voter records remains unattended and thereby available for whatever fraud is desired.

Therein is the culmination of the matters alleged above into a RICO result of violations of federal law by conspiracies of several varying known types and likely, other practices yet to be discovered.  This one instance is alleged to have been repeated in many hundreds of instances applicable to so-called "insecure drop-boxes".

The magnitude of these events may be confidently inferred (perhaps subject to confirmation by new methodology discussed following) from graduated payments to persons actually doing the harvesting whose names have been furnished by freedom of information (PIA) inquiries.

### Eye Witness to Mail-Drop Fraud

Eyewitness, and lead Plaintiff herein, Lois a Gibson (Gibson), a citizen residing in Frederick Maryland received training as an Election Judge but, on election day 2020 was ill.  She therefore was unable to serve as an election judge.  However, she was, sufficiently well and able to prepare her ballot for the presidential election.  She attempted to deliver and deposit her ballot into an official dropbox (one of eight in Frederick County) near her home in Frederick. However, she was temporarily prevented from doing so by an individual who arrived in an unmarked truck and proceeded to

-14-

deposit dozens of ballots into the dropbox from a large canvas bag he was carrying.

Gibson inquired of that individual as to what he was doing and he responded to the effect that he was transferring ballots from the post office, an unauthorized and apparently false procedure and likewise false response. The individual was using a canvas sack and an unmarked car and wore no uniform (Exhibit # 2, Declaration of Gibson).

Later at a scheduled meeting of the election board inquiries from the participants were made and the election board members responded to the effect that there were no functional surveillance cameras.  Further, no effective, or even ineffective chain of custody over drop-box collected ballots was ever described for any of the 21 Grant receiving Counties.  On information and belief, however no control or functional surveillance system exists for any such dropbox location in Maryland.  Nor existence of any such optical recording system ever been identified or described.

Accordingly, on information and belief at this time, no such control over any such remote voting custody exists.

**The Burden of Proof.**

The Constitution of the State of Maryland, through a Constitutional Amendment many years ago, created the venerable Office of the State Prosecutor. Among other duties, that Office is formed to investigate Vote fraud and irregularities. Accordingly, where it fails, and persons are injured by that failure, the state is liable, upon

presentation of valid proof.  Although that offices has been contacted, no response has

been received.  Accordingly, the events discovered, even to this preliminary phase of this

case, would seem to indicate a lapse in a vital element of control, for which the State

would be accountable as a matter of both law and equitable relief.

### The Lapse of Accountability

That is, there never has been described any chain of custody at all for

application to drop boxes. in Frederick County.  A similar lack of any reasonable control

over these crucial documents, the key to all election results, are alleged to apply to some

extent, and it appears to be very large and as a practical matter, rather easily accountable

for all of Maryland.  This is not to allege all Marylanders are dishonest, it only takes a few

bad apples to spoil the barrel.  Similarly, a few bad people can upload many thousands of

false ballots.  That is precisely what this case alleges.  And within the last two days, a new

source of fake ballots has apparently appeared, likely as an high volume source of drop

box harvested ballots.

A former Maryland resident, Mr. Kurt Kolb, has reported, within the past

several weeks of an incidence of forgery of his Maryland drivers license, and associated

Voters registration records, utilizing the automated "Eric" system (See Declaration of

Kurt Kolb, Exhibit #3).  During the investigation of the three Counties and the overall

situation regarding the magnitude of the apparent vote miscounts in Maryland, it has been

a mystery as to the origin of these apparently genuine but actually false votes.

-16-

This declaration discloses a systemic weakness whereby a likely high volume source of ballots to be generated out of thin air.  This source of "fake votes", similar in effect to deceased voters, are those persons who have left Maryland and who are easily identified by unlawful use of the newly functional tracking of both MVA drivers and Maryland voters.  In the event this case proceeds to trial, Plaintiffs would expect to examine this new system, along with the similar effects available from wrongful retention of deceased or inactive voters as an unlawful sources of registered voters ballots.  Magically generated, and then appearing in drop-boxes in the wee hours of the morning.

Further, on information and belief not only is the same situation operative to some extent across the State of Maryland, but it has recently been reported, that the legislature has recently expanded the use of drop boxes plan for the upcoming election, thereby exacerbating the already out of control situation.

### IV.  The Basics of the Fraud Financing Scheme, Alleged to Blanket Maryland:

Exhibit #4 contains copies of virtually identical (except the dollar value) of contracts between two Counties of the three counties analyzed regarding voting system procedures.

Frederick and Carroll counties, responded to PIA requests for information, by furnishing, among other data, copies of their contracts for Grants.  Howard County declined to furnish their Contract with CTCL, but employees did furnish the substantial,

but incomplete[6], financial records pertaining to both the Grant received, and purported how the Grant funds were distributed, purportedly from cash disbursement records.

Exhibit #1 lists each County receiving election aid grants from CTCL and the amount of that County's Grant.  By a separate document, the contract with each county details what the purported story is for that Grant for that County.  However, comparison to actual expenditures, See Exhibit # 5 (over 860 expenditures of funds listed by Howard County tells a different story.  Those expenditures, were sorted by individuals receiving the Grant funds for that County.  The results were acquired from information furnished by the County disbursement department.  That information is undeniable as to who, that is which exact person, actually received that exact payment of the total funds for that particular county.  This information is likewise available by Subpoena, for each of the 21 Counties and Baltimore City.

The only remaining step to prove the criminal conspiracy by each such participant is to obtain the ballot(s) placed into the drop-boxes, examine them using the latest technology, and link them to the individual perpetrators.  Such forensic examination is expected to occur, first on a test basis, prior to the hearing on a Preliminary Injunction, and thereafter for 100% of the Ballots and Envelopes, but only where the tests indicate a high likelihood of material fraud in that voting location.

---

[6] For Example, strangely, the Middle Initial of purported names of workers hired were missing on the list of over 800 disburdenments, totaling the amount of the Grant, $ 688,226. Exhibit 4.

And, the Court should note, not all such ballots need to be linked.  Only enough in each County jurisdiction to allow arrest and interrogation to crack the conspiratorial scheme wide open.  Further, examination of the 100% test sample, is by high-speed equipment even if electronic images are not retained by each particular location, or County or Baltimore.

## V.  RESOLUTION AND RELIEF

Accordingly, by a combination of forensic technologies described in detail by the testimony of Jovan Hutton Pulitzer in similar factual situations, and the new technology used in the 2000 Mules graphic video factual presentations an accurate recreation of voting results also in similar factual situations, both now past, and for the future, shall be made not just possible but practical.  This technology is now available. To the extent the fraudulent scheme was effective, it shall be disclosed and presented to the Court for use by the appropriate control and/or corrective mechanism.

## VI.  ALTERNATIVELY, IN THE EVENT THIS HONORABLE COURT DECLINES THE RELIEF SUGGESTED ABOVE:

Presuming arguendo, some that technical or practical consideration bars prosecution of criminal considerations for the past election, independently, the immediate and irreparable harm and utterly intolerable nature of this situation in the consideration of any honest voter of Maryland, and elsewhere across this Great Nation, absolutely requires this Court as a part of its very reason for existence, a looking forward into the next era of

elections.

Even the mere allegation of such a mishmash of law and order cannot proceed into our future.  There, the two problems, (1) past results, and (2) future events must necessarily be approached separately.  Any other result is chaos and nightmare mismanagement, using the kindest terms.

### IMMEDIATE AND IRREPARABLE HARM TO:
### OUR SYSTEM OF GOVERNANCE, THE CONSTITUTION OF MARYLAND AND
### THE CONSTITUTION OF THE UNITED STATES OF AMERICA
### A.  RELIEF REQUESTED

Using the Conclusion of Part One, as a starting point, with this viewpoint as the only known sensible standard, the injunctive relief demanded, or some reasonable compromise thereto, should be granted.  The status quo of the evidence in this case must be preserved in order that the obvious and egregious errors of the past are not repeated resulting in the decent into permanent chaos by our great Republic.  Indeed we are not and must not become a banana republic.  But we are on our way.

First as a Temporary Restraining Order, and as expanded, corrected, and modified on a continuing basis, subject to legislative changes to the existing flawed system if not merely apparent but, respectfully required for surficial of our way of life. So the modifications to our structure of election mechanics and laws must necessarily be viewed as not whether a fix is required, but what kind and to what extent.

There can be no reasonable argument that the past events involving

unlawful acts, if indeed they did occur must cease.  Preventing destruction of evidence as is allowed by the existing "destruct" schedule, applicable to each county or voting jurisdiction in the State of Maryland is a start.

This principle should be extended into the other judicial Districts in the United States.  The existing Federal Law is based upon normal times.  These facts are apparently typical for the entire Nation, and obviously were not meant to operate in the presence of the massive fraud, and massive dishonesty as indicated by these demonstrated facts.  And those facts are expected to be expanded at the Preliminary Injunction hearing, and later at Trial if such is necessary.

Second, although, the relief requested herein is within the guidelines of Rule 65, the necessity for a comprehensive review for propriety of the applicable Constitutional Bounds and Equity of Result, by this Honorable Court for all upcoming elections obviously necessary.

But without preservation of the evidence, there shall be no decision possible as based upon destroyed evidence.  Accordingly, that evidence needs to be preserved beyond the normal destruction date of September 3, 2022.

Third, unless exposed for what it is, faulty and lacking in basic control mechanisms, the failures of our voting system and governance, the evidence of what occurred in the 2020 election, will occur again, by application of the same faulty or erroneous counting principles and/or outright dishonest activities.

Indeed, recent actions of the Maryland legislature are to the effect that drop-box usage is to be greatly expanded.  Absent the relief requested here, that portends a

massive increase in the magnitude of use by dishonest elements to unlawfully control the election, rather than a correction. Unless we all have truly lost our minds this cannot happen

### A. RULE 65, RESTRAINING ORDER REQUESTED:

Immediately after this Complaint is accepted by the Court, a Temporary Restraining Order should issue forthwith from the Court, for Service by United States Marshall's Service, as if the plaintiffs herein are acting either *en forma pauperis*, or alternatively as a *de-facto* attorney general. Immediate and Irreparable Harm will result if the evidence, in any jurisdiction where the practices outlined herein are even suspected to have existed. And, as a practical matter;

There will be no possible material harm from this injunction simply because there will be no major upset in the preservation except a slight delay in scheduling for destruction in each voting jurisdiction, if indeed, no fraud or violation of federal election law was later found applicable to that jurisdiction.

But on the other hand, massive harm will result if indeed, the same or similar violations exist in the evidence to be preserved. If destruction occurs, it will be lost forever. Therefore, the balancing required by the Court for injunctive relief is satisfied.

The Court, through its normal injunction process should require each State to and Maryland to:

(1) Notify Each Voting Jurisdiction in the State of Maryland that the deadline of 22

months for preservation of all voting related evidence, is hereby tolled until further notice or modification by this or higher Court;

(2) Plaintiffs may serve, notice of a subpoena Duces Tecum, coupled with a sufficient number of Rule 30 (b)(6) depositions upon, the person(es) designated by the Chief Executive of each  particular voting jurisdiction in Maryland, or nearest equivalent for that particular jurisdiction most knowledgeable of the subject matter thereof of said noticed deposition, following the federal standards pertaining to Rule 30 (b)(6) depositions; and subpoenas accompanied by the necessary  documentary information, and shall require:

(a) the highest officer of each particular jurisdiction to identify, under oath, by the person or persons most likely to possess such knowledge (a sworn response, and lists, identifying and indexing in easily legible form, in English, or suitable electronic word processor, each type of record evidence existing as of November 3, 2020 and three months before and at all times thereafter, and the custodian thereof of, describing without limitation of any kind, the following or all other information necessary to describe:

(i)  All paper ballots and associated envelopes; of if such exist, any paper or other written depictions of any purported individual ballots.

(ii) All electronic or optical or other storage media of voting materials.

(iii) All financial records pertaining to monies or items of value in any way related to voting records or the voting documents themselves, including, but not limited to Grants

from any Outside of that particular jurisdiction source including federal government

agencies.

(iv) the names, social security numbers, addresses and date of birth of each person

receiving pay, or anything of value, and the amount thereof for performance of any duty

at all pertaining to the presidential election of November 3, 2020, or thereafter, if this

case lasts that long;

(b) A certification under the penalties of perjury, by the Officer(es) described in

paragraph (a) above, that the items furnished conform in substantial compliance with the

requirements of full and complete disclosure of the requirements of this Order.

( c) That the materials required shall be delivered to the respective United States

District Court by electronic means, in PDF format within 21 days of service upon each

such person, or an alternate with explanations as to the substitution or failure to be

furnished within 7 days of the due date thereof.

So Ordered,

_____
United States District Judge
For Applicable Jurisdiction.

## B.  SCOPE OF THE INJUNCTIVE RELIEF REQUESTED

It is counsel's understanding based upon current information as of this

particular defendant CTCL, functioning out of a home base in Chicago, Illinois has also

operated in other so-called "swing states" during the presidential election of 2020, and continues to operate in various locations across the nation today.

Plaintiffs understand the burdensome nature of the relief requested in this case however that burden is deemed minimal as compared to the chaos and upset resulting from the operations of this purportedly tax-exempt charity, but actually herein alleged to be a subversive of other enemy of the Constitutional Republic, the United States of America.

Further, it is recognized that similarly situated persons, even other charities but in reality, RICO entities who are a part and parcel of this RICO Entity are also in fact, subversive organizations may be performing identical or very similar unlawful acts.

In that event, as found by this Court, or other constitutional entity, those components of the RICO Enterprise alleged herein, are likely to exist elsewhere.  The result is the same, regardless of subsidiary camouflage and classification as a RICO Enterprise with intent to destroy our way of government.  And it, so far, has worked.

## C.  DECLARATORY JUDGMENT OF A RICO ENTERPRISE INFLUENCING ELECTIONS:

Accordingly, the RICO Enterprise definition fits and should be liberally applied to render such operations wheresoever found, extinct.  The scope of this complaint therefore, is suggested and requested to the Honorable Court as requiring a flexibility of jurisdiction and venue across the country proceeding in accordance with the

existence of these evil elements of our society, destructive of our nation as a whole as a matter of planned policy and intent.

Subpoenas are requested to be authorized and expected to be served upon each County or Jurisdiction receiving Grant funds from CTCL, and CTCL itself.

Ancillary thereto, subpoenas for the financial information for all persons to which such "Grants", or other payments for services purporting to be for vote collection, distribution or delivery of forms is necessary evidence.  Such evidence is obtainable from any organization or person receiving funds purporting to be for election related services. And as such, it is a very small, but highly illegal but effective step to influence a person short of funds, food or medicine, to vote for the candidate furnishing the benefit.

In consideration of all of these practical difficulties, expedited permission for a F.R. Civ. P. 30(b)(6) subpoena and depositions of at least each of the three example Counties are hereby requested as a permissive matter within the limited scope of the Temporary Restraining Order, with a view toward completion before, and therefore usable at the projected hearing on the Preliminary Injunction, or even at an accelerated trial on the merits.

## VII.  EVIDENTIARY BASIS FOR THESE ALLEGATIONS

The allegations of fact herein are verified by the Declaration of an official to an informal group of many investigator/citizens, the Chairman and Secretary of that group, Lewis T. Porter attesting to the veracity of the documents accompanying this filing

and his experience and observations in over a decade of citizen service to the community.

Other declarations of specific facts are supplemented by reported admissions of party

opponents, and persons of authority producing official government records, admissible

under the business or banking records rules of evidence.

RICO Enterprise allegations of this Complaint, are supported by a

voluminous and detailed information, entitled "The Reconciliation".  That report was

prepared and widely delivered by the group 20-20 Watch, to the Courts the election

structure, and the Governor's Office. concerning the voting events in Baltimore during

the 2016 election.  This report was striking in nature in describing the various vote frauds

before, during and after that presidential election of 2016.

The RICO statute allows a 10 year period to present such evidence, that

evidentiary material.  That evidence is also available as probative evidence in support of

the injunctive relief to be requested in this case as well as for presentation at the hearing

on the Preliminary Injunction and for trial.  In sum, the  Baltimore 2016 evidence

parallels the findings contained in the Maricopa County Arizona presented just in the past

few days, in June 2022.  Despite a full disclosure by Mr. Porter to legal and election

authorities, and the Governor, no corrective action has ever occurred to the knowledge of

20-20 Watch or Mr. Porter.  Essentially the frauds disclosed remain uncorrected.

As to the current financial payments to each of the 21 jurisdictions,

including Baltimore City who received funds, that information was obtained from a

referenced source,, fully verifiable with IRS sources as well as each Voting Jurisdiction's financial records.  Also, obviously, the individual monies paid amount is ultimately verifiable to the source, either CTCL itself, as to the Grants.  or the non-profit charitable division of the United States Internal Revenue Service.

As a matter of existing law, those particular IRS records are required to be furnished in annual reports from each such donor.  All of these allegations and requests are based upon the admissions of a party opponent of the existence of the specific provisions of the signed (similar or substantially identical) contracts of each of the 18 Counties with the purported RICO Enterprise-CTCL and the individual Counties-Combined.  (See Contract Examples- Exhibit #4).

CTCL received to date from Frederick and Carroll Counties, substantially identical Grant Contracts, substantially the same as to format and terms.  Each signed Contract, required specific, but innocuous political and tax neutral tasks (and of course, de-facto existing, and expected to be in the basically same boiler-plate format.  Howard County refused to produce the form, but all such 21 Counties are expected to be subpoenaed immediately after this lawsuit is accepted by the United States District Court.

As a matter of law, such identical contracts must in fact exist, must de-facto exist since the funds have indeed flowed distributing those funds are as a matter of law reported in the respective County or City records. Again, see the listing each recipient of the total funding of the $ 6.2 million as per Exhibit # 1,

Howard County, the third county examined in some detail, declined to furnish the contract documents known to exist between it and CTCL.  However, employees of Howard County did furnish comparatively comprehensive details on the money spent, along with the admission of the exact amount of the Grant.

Those details are revealing.  See Exhibit # 5, listing of monies spent which appear to be entirely payments to named persons.  The total dollars paid from this list, appearing to have been furnished by Howard county employees equals the grant amount for the county of exactly, $ 688,226.  Plaintiffs allege that these amounts paid and received are not as contracted by the County with CTCL, and believed to have been paid wholly or in substantial part to harvest and/or deliver Ballots associated.  Details of actual subjects of services rendered are expected to be elicited prior to the schedule set for the Hearing on the Preliminary Injunction.  The requested early approval of the Rule 30(b)(6) subpoena and key person(es) depositions is expected to reveal details of how the money was spent, and the degree to which the election law violations, and/or fraud occurred.

Based upon public information dollar numbers, Howard County received $688,226; Frederick County received $121,975; and Carroll County received $76,536, all from CTCL

Based upon the monies received by the 18 counties of Maryland accepting grant funds from CTCL and financial information received from Howard County on information and belief many hundreds and likely many thousands of unlawful ballots

-29-

were deposited into unmonitored drop-boxes in these three counties analyzed.

Definitive proof in the form of forensic analysis of the ballots by now well known technological means, demonstrated to be such in the Arizona audit, amongst others appears to be a readily achievable and practical result.  But only if such analysis is made available of the now existing ballots, and other materials, including envelopes all of which are slated for destruction but for the requested protective Order in the form of preservation by the TRO and/or Preliminary Injunction.

## VIII.  Preliminary Injunction and Trial Proof Matters
## Financial Information of Misuse of Grant Funds-Ballot Harvesting.

Plaintiffs' request to preserve evidence including financial records, paper ballots and envelopes should be granted beyond the existing September 3, 2022 Federal Law preservation date.  In that event, related materials, records of electronic banking, financial records and all other matters related to the election voting and record keeping process, should also be preserved.  The preservation should be between the time of the hearing on the Preliminary Injunction request and trial.

The geographic scope of the preservation should be for all jurisdictions accepting Grant monies as presented in Exhibit # 1, those 21 jurisdictions.  Evidence now known to exist for the three counties examined, although purported to and contracted to be innocuous shall be demonstrated to be used in large part unlawfully influence election results.

A large component in the unlawful influencing is expected to be demonstrated to pay couriers (Mules) for collecting otherwise transporting, collecting, and harvesting ballots by unlawful means.  Also, very recently discovered evidence demonstrates that individuals that moved out of Maryland, (Exhibit # 3) and deceased voters have in fact received ballots in some Maryland Counties.  The matter of deceased voters is not new, but the persons leaving Maryland, and tracked by the automatic ERIC system is an apparently brand new and high potential volume of fraudulent source of genuine appearing, but fraudulent votes.

These are expected to be  be investigated via subpoenas, to determine the magnitude and reported upon in expected post injunction hearings and/or trial the trial on the merits.

A detailed listing, apparently from Howard County cash disbursement records, apparently correspond exactly with the Grant amount, of $ 688,226 the amount listed as a grant received from CTCL.  Large payees listed are expected to admit payments received that are contrary to contractual strictures with CTCL which demonstrate violations of election laws, and likely tax law.  (See Exhibit # 5).

## IX.  Alleged Falsification of Financial Records CTCL Election Grants, Hidden Influencing of Votes; Presence of Tax Fraud:

But the setting, that is the magnitude and scope of the evidence of financial, RICO and vote fraud and corruption as presented herein, requires that consideration of

the County judicial voting districts be presented as it applies to a the whole State, Maryland.  This requires considering the obvious fact that some of the Counties in Maryland did not participate in the alleged frauds allegedly conducted by  those that accepted the Grant funds used for the nefarious purposes other than as reported.  All of the Grant funds were subject to a specific purposes, and reporting of how spent is a contract as well as tax necessity.  Accordingly,  any funds for which the proper purpose cannot be proven by the County, should be presumed to be for the purpose alleged, the recipient having undertaken by contract the enhanced burden of proof.

But, also hopefully clarifying this situation are very recent and striking new technological events, which lend some hope of resolving the technical difficulties of reconstruction of the ballot counting process, not just for Maryland, but for the entire Republic.  This is our hopeful prayer for the future, and one which is based upon our Constitution, and the laws in both Maryland and the Nation.

These plaintiffs will present a balanced picture of the catastrophic events which are taking place, even as we file this claim for relief, with a suggested path, starting immediately with injunctive and other equitable relief designed, along with expert aid and advice with the guiding hand of this Honorable Court.  This new path, hopefully uses the existing structure of our great Constitution and the structure of our law within that framework.

For this reason, the facts describing the various unlawful activities, and

possible solutions to the difficulties presented encompass RICO activities as a reality. The "presence of fraud" in these events is very real.  But the analysis of the magnitude and effects of the frauds upon the actual vote counts, is indeed subject to resolution, ONLY, if the evidence is preserved, first for the historic 2020 election, and then using that framework as what NOT to do, create a sound framework under consistent law for the future.  Thereby our way of life and freedoms may be preserved.

   This situation and solution covers both civil and criminal activities with a wide range, both in geographic and law, for presentation to this Court.  First, this case proposes to discuss, and solve the status of vote integrity in Maryland and secondly effects upon the rest of the Country.  Plaintiffs, hopefully, based upon the hope and trust, indeed an expectation that this Court would agree with the basic propositions and fact put forth herein, not because of some random factor, like party affiliation, or political view, but because the facts presented are incontrovertibly true and correct.

## X.  CONCLUSION

   Plaintiffs submit that the existing crisis is one involving the very survival of this country and our way of life as a Democratic Republic.  Whether or not the structure of our judicial system can handle the demands now before it is of the greatest imaginable importance.  In such a situation our Constitution has been designed to be flexible.  We respectfully urge the Court to consider these matters as presented in this light, utilizing the wisdom of the Constitutional structure, and truth, to guide all of us to a resolution of

these difficult and unprecedented times.  The citizenry are entitled to fair, and unbiased

treatment, and consideration of all of the facts relevant to matters governing their

existence, heritage and the rights of their progeny into the future, and expect this

Honorable Court, so help us God.

## XI.  F. R. Civ. RULE 65 (b) REQUEST FOR
## A TEMPORARY RESTRAINING ORDER FOLLOWED BY
## RULE 65 (a) PRELIMINARY, AND PERMANENT INJUNCTIONS

The evidence in this case as summarized herein, demonstrates that there is a

substantial likelihood of immediate and irreparable harm resulting from destruction of

evidence of unlawful activities both civil and criminal which occurred during

immediately prior to and immediately after the presidential and state elections of

November 3, 2020. According to existing statutes records retention requirements expire

on or about September 3, 2022 when the expiration of 22 months shall have occurred.

Accordingly, this Court is requested to enjoin any and all destruction of

materials protected by Title 52 U.S.C. § 20,701, from the date of filing of this complaint

until the prohibition is lifted, either automatically or by Court order.  There shall be no

material risk of substantial damage or harm by the granting of this injunction and great

harm could arise in the event of destruction of material and relevant evidence of

wrongdoing alleged herein by election officials in virtually every county in voting

jurisdiction in the country. A draft temporary restraining order, and Preliminary

Injunction as requested and required by rule 65 is presented following.

For reasons detailed hereinafter, the 22 Month Records Preservation rule

should be extended for all matters, effective immediately, first as a Temporary

Restraining Order, for all such Records for all Such States, because of matters detailed herein.   And, upon the expiration or Hearing at the time of the Preliminary or Permeant Injunctions, extended until discharged by a hearing on at permanent injunction at such time as all issues raised herein have been resolved[7].

## XII.  Likelihood of Destruction of Material and Determinative Evidence, Consequences, Irreparable Harm Requiring Protective Injunctive Relief:

A Protective Order should be issued with immediate effect, in the form of a Temporary Restraining Order (TRO) followed by Preliminary and Permanent injunctions. This is necessary for immediate effect because of ongoing resistance indicated by persons, all over State now in control of the actual physical evidence which needs to be protected from destruction pending resolution of this litigation.

---

[7] Federal Code requiring preservation of Election Evidence for 22 months, Otherwise expiring on or about September 3rd , 2022.
Title 52, U.S.C. 20701: Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation Text contains those laws in effect on June 18, 2022
**CHAPTER 207-FEDERAL ELECTION RECORDS**
§20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.
( Pub. L. 86–449, title III, §301, May 6, 1960, 74 Stat. 88 .)

No harm will result from preservation since the only interference will be in preservation of the status quo as a mere continuation of the present 22 months beginning November 3rd, 2020, by existing law. (52 U.S.C. § 20,701).

Substantial evidence has been gathered in this lawsuit and well publicized other civil actions to the effect that fake and false ballots and errors, both intentional and planned have occurred, not just in this jurisdiction but across the nation.  A Temporary Restraining Order, followed by a Preliminary Injunction is requested to prevent destruction of all such election related materials in contravention of that statute, 52 U.S.C. §20701. (Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation), and the need for forthwith extension of the time of application of the evidence described herein by the Court with its emergency Protective Order powers.   Vital information on the mechanism of election fraud shall be lost forever, but for this Court's prevention of destruction.

A draft Temporary Restraining Order is attached as Attachment A, in accordance with Federal Rule of Civil Procedure 65 (d).

Plaintiffs hereby request a Protective Order preventing destruction of Election Materials, including, all electronic financial records of employee or independent contractor, or machine equipment contracts, paper or electronic Ballots, and Envelopes, until such time as this Honorable Court may hear the follow-on Motion for a Preliminary Injunction and rescind or modify the Order.  See Accompanying Exhibit A-- Draft

Temporary Restraining Order for Election Material Preservation (TRO)(Attached).

End of Part One.

-------------------------------------

**Part Two, Summary of Facts;**
**Followed by Detailed Facts and Proposed Orders;**
**Evidentiary Exhibits;**
**Temporary Restraining Order-- Draft;**
**Preliminary Injunction and Restraining Orders– Reserved**
---------------------
**Comments on Legislation– By Amicus, —CSEAEIF, Inc- - Reserved**

----------------------
**XIII.  SUMMARY OF FACTS**

**IMMEDIATE INJUNCTIVE RELIEF IN THE FORM OF**
**A PROTECTIVE ORDER**

**(PREVENTING DESTRUCTION OF**
**ELECTION EVIDENCE NOW SCHEDULED FOR DESTRUCTION IN**
**LESS THAN 90, DAYS, ON OR ABOUT SEPTEMBER 3, 2022).**

**Background of this Case and Request for Injunctive Relief:**

The facts alleged herein, in the form required by Federal Rule of Civil

Procedure 65, and verified form as required by the rule leave no doubt whatever that if

the conditions in voter integrity and proof breakdown and corruption continue into the

next cycle without interruption similar results will occur.

This conclusion is inescapable.  The counting of votes is intrinsically a very

simple mathematical exercise. However, like any simple mathematical exercise it must be

correctly done.  AND there is only one way to do that, THE CORRECT WAY.  This must

be done without any hint of systemic fraud or dishonesty or manipulation in the process.

Sadly, a correct result for the future can be possible without corrections to

existing politically and dishonestly corrupted procedures and enforced by honest persons

of authority.  Under our Constitutional scheme that process and Authority, as the last

resort, is this Court, as the method of last resort in this State.  The examples given below,

amplified by the revelations of the past election cycle makes this conclusion, also

inescapable.

## XIV.   DETAILED STATEMENT OF FACTS

22.  This filing is believed to be an unprecedented, unique, but likely determinative

of the future of election fairness in at least for this State.

23.  The designation and classification of this case as a potentially multi-district

Federal and Maryland class action appears to be warranted based upon similarity of

claims, and information now available on similarity of methodology of election fraud now

known to exist in multiple, but likely not in all jurisdictions, in the United States.

24.  Accordingly, this case is filed on behalf of all honest American citizens who

have been deprived of their Constitutional freedom and right to a fair election in

Maryland, and elsewhere across America, for now and forever with a hope and trust in

God, that this Country as we know and love it survives.

25.  Nation-Wide fraud and money laundering, has undoubtedly occurred and shall,

unless stopped in its tracks, occur again.  In the 2020 election, in Maryland, in a series of

Twenty-One fraudulent payments to County Government, through apparently normal

official budgeting receipt channels, payments, disguised as "grants" totaling for the 21

counties, $ 6, 245,797 (million) dollars, monies were "Granted" to 21 Jurisdictions in Maryland.

26.  Apparently through a uniform process by a carefully controlled, "conditional agreement", on information and belief, the same "Grantor" (CTCL or Grantor) in a separate "Boiler-Plate" type document for each county of the 21 County example) in Maryland, through their party controlled leaders, donated a substantial sum of money designated for particularly defined uses related to the Presidential Election of 2020.

27. Those funds were carefully proscribed to be spent, by the Grantor, and agreed in writing as a signatory to the Grant Document by the County Management, for a particular (purportedly) innocuous and perfectly lawful, usage.

28.  But, disclosure of the money spent does not conform with the stated purposes. The funds were just not spent that way, in fact a large proportion of the funding are alleged to be for unlawful purposes designed to aid one party, the one party favored by the Grantor.

29.  This allegation, if proven to be true, as it appears from the three County sample of financial records examined would be a massive violation of election law as well as tax law, filtering down to every individual who performed any unlawful service.

30.  Such violations, by individuals and supervisors would necessarily be in violation of any of the applicable laws.  In addition, all financial officials would be misreporting budget funds to the extent any misspending or misreporting occurred.

-40-

31. The purported purposes, clearly were disguised, designed and incorporated into the "Grant Agreement Document" strictures to fraudulently protect the tax exempt status of the Grantor, but ONLY IF, the Grantor's Agents, or Principal Donors, knew or should have known that BOTH the Grants and the Facilitators, the Harvesters paid the big money listed on the disbursement sheets.

32. It appears, and Plaintiffs allege, that these money launders were, either the couriers who delivered the harvested and created unlawful votes, or they conspired with the persons who got paid for delivering them to the drop boxes.  In either event, these persons who received the money, and those that handed it out, were in fact unlawfully biased.

33.  Similarly, so were the very agents doing the negotiation, for the Grantors, CTCL, and for each receiving County.  Implicitly, its management as well as the Grantee participated in the Tax fraud which are imbedded into this RICO fraud conspiracy process.

34.  In this regard, Plaintiffs seek the immediate permission to conduct at least one Rule 30(b)(6) deposition from each of the three analyzed counties, Frederick, Carroll and Howard, on a forthwith basis.

35.  Permission is requested to require, immediately upon service, that each County to furnish the person or persons who negotiated with the Grantor, and those who assigned personnel and equipment and expended the funds donated including record-keeping on those expenditures, including personnel for a Rule 30(b)(6) deposition, after responding to

subpoenas for the relevant documents for each county where material deviation from normal is indicated.

36.  It is expected that testimony will be elicited to the effect that the requirements expected by the Grantor (CTCL) included prohibited practices, and the Grantor's funding persons were well aware of the unlawful nature of the actual requirements as distinguished from the purported fraudulent requirements of the written Grants. This was because neither the Grantor, nor the Grantee ever expected those "paper" requirements to be followed.

37.  If those requirements were serious, and other than a fraud which they were, there would have been some follow-up, corrections and corrected reporting on the actual incorrect, i.e. overpayments, underpayments or simple reporting errors, or missing a required limit.  It is telling that not only were there none, there were not even any semblance of any such bookkeeping adjustments.

38.  However, after three counties of comparisons, there were no such corrective actions, not a hint of a single one.  This apparent fact demonstrates forcefully the fact of the subterfuge.

39.  In this regard, Plaintiffs request permission to advance and notice several 30(b)(6) depositions, along with necessary subpoenas, forthwith, before the hearing on the Preliminary Injunction to clarify facts necessary aid the Court at the time of the Preliminary Injunction hearing.

40.  This information, easily obtained, will demonstrate this key element of the financial manipulations of each counties record. This is evidence demonstrating the financing element of the actual vote counting fraud throughout the State of Maryland.

41.  As a related but different aspect of the presence of fraud in this entire situation, those same manipulations were in fact an enabling fraud which  violated Federal Tax law, both individual (as to the contributors and managers of the "purported charitya', and lack of enforcement by IRS as a federal agency.  The truth is, that the purported tax constraints were nothing but sham requirements designed to facilitate and hide the real purpose of the alleged charity, vote fraud, paid for by our own Federal Government via loss of tax revenue by extremely wealthy contributors.  The requirements were merely a fraud for subverting the legal requirements with camouflage, and the fraud worked, beautifully.

42.  It has been admitted by the Elections Board of Frederick County, by its chairman, a county employee, that for the past presidential election, there were 8 drop boxes in Frederick, County and Eight cameras for surveillance.

43. And none were ever monitored (Admission of party opponents in open meetings).

44.  The lead Plaintiff, Ms Gibson, was on election day, a trained Judge of elections, however, she was ill and therefore could not serve as a judge.  However, she did vote, at one of the drop boxes.  She, while attempting to deposit her ballot, observed and

interacted with a person depositing a substantial number of ballots into the drop-box and inquired, "what are you doing". The person responded, "I am making a delivery from the Post Office", then quickly got in his vehicle. (Declaration, Lois Ann Gibson) (Exhibit # 2-1).

45. When later, at a Board meeting, further questioning elicited the responses to the effect that the video tape cameras were never monitored, so all such events have for the entire period of drop-box use, apparently been without any intervention, control or monitoring whatsoever. All of this failure is contrary to the requirements, of the Maryland constitution for which the State of Maryland, and the Maryland State Prosecutor have the duty to monitor fraud and abuse. They failed.

46. An oral admission from the Board of Elections of Frederick County is believed to report that the surveillance cameras for the eight drop-box locations were privately owned, privately controlled, and no examination at all has ever been made of the tapes which would indicate with specificity the identity of the couriers acting as mules for the fake overrun ballots.

47. This entire subject shall be explored for available probative evidence utilizing 30(b)(6) depositions and subpoenas just as soon as the Court authorizes such usage. The suggested plan (at this time, subject to change) is to start small to obtain details on the methodology of the fraud, present the facts at the hearing for a preliminary injunction, and plan the trial evidence gathering soon thereafter.

48.  All of the 21 Counties would be expected to be analyzed for fraudulent drop boxes and addresses,  in detail, with the burden placed upon the County, in each instance to show a reasonable methodology preventing fraudulent count results.  All of this would be prospectively applied and controlled, with the consequences of the past election to follow as dictated by the Court to follow in due course thereafter.

49.  The accounting records for the three counties examined indicate manipulation of the county disbursement records to conform to the penny to the grant amounts.  As an accounting matter this item alone renders these figures suspect.  These indicators cumulatively demonstrate that it is extremely likely that the identity of the recipients of the funds, which does appear to be recoverable via subpoenas, coupled with a deposition would indicate with specificity that these particular persons performed at least some of the fraudulent acts.  Those resulting, in counting of inactive voters and deceased voters, for example, and the electronic manipulation of ballot results.

50.  This conclusion conforms to the results observed across the country and the strikingly similar pattern of the unlawful *Corporate* Financing of the voter fraud.  See below for confirmation of this actions of the part time workers, hired by the unlawful corporate money.  These actual tasks, as compared to the non-partisan tasks for which they were purportedly hired shall be gleaned, for those part time workers specifically, one way or another, by the planned subpoenas and depositions, hopefully as approved by the Court on an emergency basis prior to the hearing on the Preliminary Injunction.

51.  On information and belief, all of the voting machines in Maryland are all under the control of the Dominion/ES&S Rico Enterprise, rented or owned or otherwise a controlled system.  This system, and management controls are well established to have online capabilities and manipulation capabilities actually observed as such on multiple occasions.

52.  Repeated inquiries for a description of the chain of custody of ballots removed from drop boxes (if any exist and subsequent handling), i.e. , placing of ballots into the boxes, removal from the boxes and forwarded ballots to machine counting or other accumulation stations.  Control counts apparently for the three counties apparently do not exist.

53.  Certainly, no such detailed descriptions of control methodologies have ever been received in response to inquiries.  No response at all has ever been received from the three counties examined.  And again, no surveillance tapes or results have also ever been described in materials received, and apparently, on information and belief, do not exist.

54.  This aspect of the analysis for the three counties is presently being re-verified, and shall be subject to the subpoena process in the interim between the filing of this complaint and the requested hearing on the Preliminary Injunction.

55. On information and belief a substantial number of persons received funding from participation in the collection of ballots from voters, and distribution to drop-boxes.  See testimony of plaintiff Gibson (Exhibit # 2-1) and adjoining County detailed payments, (Exhibit # 5) , and the newly discovered scheme (Harvesting unused ballots from voters who have left the state, via the ERIC system, Exhibit # 3).

56.  Disbursement records disclose that some individuals received multiple checks or money orders for paid activities that remain undisclosed in the disbursements record, despite repeated inquiries.  Relatively large sums of money for specific persons who received more than one check have been observed, without the explanation of duties required by the Grant Contract.  As mentioned earlier, three persons from Howard County received identical sums of over $ 11,000 each, out of a total of over 800 individual money distributions.

57.  A Federal Rule of Civil Procedure Rule 30 (b)(6) deposition coupled with a subpoena for disbursement documents is presently being requested to be permitted, one such subpoena and deposition, for each of the three counties for which the initial investigation leading to injunctive relief is requested.

58.  Similar inquiries are expected based upon the successes to be achieved by this investigative result during the immediate interim week following filing of this complaint, as applicable to the remaining 18 Counties receiving Grant funds (Exhibit #1).

59.  A substantial equipment expenditure appears in disbursement records for the three Counties for which expenditure data was only partially acquired.  The request for several subpoenas pursuant to a Rule 30(b)(6) deposition, and equipment disclosures shall include a production and/or inspection of all such equipment, and also ballots, with envelopes made available for inspection and copying for test purposes.

60.  It is expected that a subpoena for production of all electronic images of voting

and actual paper ballots and envelopes will require a subpoena for leave to examine all ballots by electronic equipment, likely for all three sample counties.

61.  To date requests for such complete production have been resisted, (in two of the three examined counties) accompanied by a demand for payment for purported retrieval expenses.

62.  At the hearing for a Preliminary Injunction, a request shall be made for a protective order requiring production of each and every ballot and envelope as well as electronic images, to the extent such exist.  It is not expected that such production will be on an emergency basis, but a substantial testing is necessary for a complete analysis of the allegation that false or duplicate copies of ballots were manufactured as a part of the alleged fraud.  Such forensic testing is now well known to be within the state of the balloting art and science (Ref. Jovan Hutton Pulitzer, et al).

### Three Kinds of Fraud in the Grants

63.  The three kinds of fraud in the Grants are: (1) To hand out money, purportedly for a lawful purpose, but as a hidden yet operative part, the real agenda, is to never countermand, or challenge the misuse and misreporting by the governmental agency of the actual unlawful use of the funds, and the cover-up of the misuse by misreporting.  The actual use of the funds, that is the actual monies spent from the disbursement records have been furnished.  Those expenditures do not comport with the purported uses required by the Contracts.  Again, the use of at least one Rule 30(b)(6) deposition as to what was done,

and the associated equipment expenses is expected to elicit details of specific matters directly related to election ballot and counting fraud.  This fact has implications wherever it has occurred.  And it appears to be identical from the consistency of the contracts required for rewarding of the Grant(s) across Maryland (See Exhibit # 1, - grants from same grantor, $ 6. 2 Million). (2) disclosure of tax fraud by those large -money contributors.  (3) the Grantor fund would itself be participating in a tax-fraud and would lose its exemption from tax laws retroactively, with parallel effects upon its donor contributors.

64.   The purportedly innocuous classification of Grant Use matters are by no means routine violations or mere error.  Such manipulation of decades-old IRS Section 501(c)(3) principles are: (when demonstrated to have occurred with knowledge or intent as appears herein) would be in reality intentional violations of Tax law, by both the Grantor and the Grantor's principals, those with knowledge, who participated in the tax evasion as well as the misreporting of fraudulent received funds, with intent to subvert the election laws of the State of Maryland as well as the Tax Laws applicable to non-profit 501 (c)(3) organizations (For Example, Defendant CTCL) .

65.   The existence of these malfunctions have been disclosed and are alleged in this filing. Given the apparently reoccurring and casual nature of the misreporting discovered as to the three Counties investigated, to date but only considered as a voting integrity matter, the evidence is nevertheless clear.

66.   For this reason, all records of all related financial transactions, Grants, reports of expenditures, 1099 forms for all employees, whether regular or temporary, to deliver and pick-up ballots, or otherwise are hard documentary evidence of the intent to use misstatements of or mislabeling of entries into financial records to cover-up the fraud in the ballot fabrication and false delivery process.

67.   And this process will undoubtedly be repeated in future elections unless it is corrected forthwith, with this lawsuit.

68.   Second, the Grantor, the non-profit organization, would upon demonstration of a biased, non-qualified for charitable taxable use of Grants, be expected to lose its tax exempt status under IRS Code Section, 501(c)(3).  In this event, where the contributors conspired with the Grantor, and took tax deductions, they would be expected to be participating in a tax fraud.

69.   If, as reputed, large contributors were involved with knowledge of these improper tax deductions, those Contributors could be liable for recovery for Tax Fraud, and possible false claims act liability.

70.   This disclosure would be expected to have severe consequences to each of the large contributors who it appears have funded the unlawful nation-wide constitutional violations, while being rewarded for their unlawful efforts with large tax deductions, to which they were not in fact eligible.  Such considerations would be a related matter to the main thrust of these claims of voter fraud.

71.  Cleverly, and apparently incorrectly, and if with knowledge of the falsities, the agreement with each conspiring donee voting jurisdiction (a County, like here Frederick, Howard, and Carroll, and presumably 18 others) would have to agree to spend the money for the legitimate purposes as agreed.

72.  If the constraints were not met, as they apparently were not, at least in some instances, each such failing jurisdiction would purportedly (under the terms of the contract) have to refund the Grant.  Apparently none have done so.  Each such instance would be both a voting law violation, and a tax law violation, and each such fabricated vote would be a constitutional violation if each plaintiff voter whose vote is negated by the false procedures.

73.  New technology now aids in identifying and proof of the various methodologies to catalog and prove each type of fraud.  This has now become practical, given the disclosure of the Ballots and Envelopes, to an amazing extent.

74.  To the extent each official who disbursed the money and covered up the failure to spend it as agreed, that person would also be committing, or at least aiding and abetting the overall tax evasion scheme, for every 1099 error and each tax deduction as well.  If any part of the funds were used for an unauthorized, or unlawful purpose, that County would be in violation of the Maryland Election law.

75.  To the extent this evidence, when placed in good form via, subpoenas and depositions an election law violation has occurred, and will thus occur again unless this

-51-

system is disassembled by legal edict, of one kind or another.  This malfunction of the working persons level within each county government accepting such funds now has become clear.

76.  To this end, once the equitable relief necessary for corrective action become effective by Order of the Honorable Court, it appears that corrective action in the form of legislative actions, or even jury decisions may become necessary as determined according to constitutional constrains under the existing Twombly/Iqbal standard,

77.  Nevertheless, as to Grant funds received and expended, the evidence clearly shows, when finally produced, after years of attempting to obtain it, the purposes for which the money was spent do not conform to the agreed in writing, election neutral purposes.  Testing of actual uses of the funds as comparted to the required partizan neutral requirement is expected to demonstrate unlawful bias pervading the Grant distribution process along prohibited partizan lines.  And also cover-up of the violations by knowingly false financial reporting.

78. Thereby, the honest functioning of Maryland's entire constitutional process is not only threatened, but virtually guaranteed to fail in the upcoming election as well.   All that must occur to assure this result and to assure the replication from now on, is a simple expansion and repeat performance of the "Gibson drop-box trick" which is, by all of the available evidence, now alive and well in Maryland.  (See, Exhibit # 2,1.  Declaration of Witness, Lois Ann Gibson).

79.  To demonstrate the magnitude and the prevalence of the unlawful practices in Maryland these Plaintiffs submit herewith both anecdotal and sampling evidence demonstrating the existence of election fraud.  The frauds have occurred, both in the biased financing of the election operations, in hiring of personnel and the false and/or inaccurate reporting of funds spent as received from Grants, and in the misdirection or obstruction of inquiries regarding expenditures of "Grants".

80.  All but three Counties in Maryland have partaken of the funding by outside influences, subject to control over the spending.  That control, apparently is uniform in abuse of not conforming to Federal Guidelines, this also being apparently a tongue- in-cheek, disguise according to the sampling completed as of the date of this filing.  The first three counties for which data has been retrieved and examined.  18 more counties have received the suspect funds, but expenditures have yet to be analyzed by plaintiffs herein. See Exhibit # 1 for Total Funding Reported for Maryland, subject to analysis. $ 6,245,797.

81.  The events described in this lawsuit, unless placed under judicial control, immediately, threaten the stability of the Republic, threaten to destroy all hope of any fair election process for all time.

82.  This filing is also pursuant to the Constitution of the United States of America and the Constitution of the State of Maryland's believed to be unique Amendment.  That amendment, established the Maryland Office of the State Prosecutor [8]with the jurisdiction and specific power to investigate election fraud.

That agency has not yet responded to our requests for an investigation and/or

---

[8]Maryland State Prosecutor - Origin & Functions, https://msa.maryland.gov › msa › mdmanual › html.  The office of State Prosecutor was established by Constitutional Amendment in 1976 (Chapter 612, Acts of 1976, ratified Nov. 2, 1976).  Part of the Constitutional duties of that Office is to maintain election integrity, free from fraud or political abuse.

aid in the investigation of the factual underpinnings of these Class Actions.

83.   This filing is also, pursuant to federal rule of civil procedure 23, alleging, among other violations, a RICO conspiracy by multiple parties, alleging fraud, money laundering and bribery; a conspiracy to violate federal constitutional liberty, due process of law, and federal and state civil rights (abrogation of voting privileges by fraudulent dilution of valid votes.

84.   This filing is also against the State of Maryland in that the Constitution of the State of Maryland, in an Amendment thereto established the Office of the Maryland State Prosecutor, with the specific jurisdiction and authority to investigate Election related violations of law and fraud.  This State failed to carry-out its duty to insure that the voters systems and function were free from fraud, manipulation and malfunction.

85.   Accordingly, the State of Maryland should be held accountable for all expenses of remedial action with regard to all of the matters herein, and funding of corrective measures including the attorney's fees and costs of this litigation and all cures required to create a workable fraud free system beginning immediately.

86.   This prospective loss of the right to vote, is material, genuine, and undeniable, both as to what has previously occurred, and prospective continuing irreparable harm absence of the required extraordinary corrective action.

### Immediate and Irreparable Harm Has Occurred and is Continuing:

87.   Immediate and irreparable harm has already occurred, is continuing, and is, on information and belief is now being planned by the wrongdoers to be repeated.  Thereby absent extraordinary emergency action by this Court shall be not just continue, but to be exacerbated, and will occur again into the foreseeable future.  There is no reason why any

doubt whatever exists as to the likelihood of these fraudulent actions to continue.

88.     Need for Injunctive Relief with evidence Protective Orders, Witness Protection and

mandatory financial and date protection Orders are required to extend the preservation of

evidence to Conform to   52 U.S.C. § 20701 until full knowledge of these complex facts

can be disclosed, corrected and expunged for all time from our governmental acceptable

function.

89.  These acts shall continue, as in the normal course, with continuing immediate

irreparable and unconscionable damages, so long as the denials of rights extant in the

occurrences of the past and foreseeable future are not corrected.  All of this is contrary to

the contract contained in both the Maryland Constitution, and the Constitution of the

United States of America. The Property, Liberty, and Voting Rights, of each State of their

residency's guarantees, (for example here) these Plaintiffs, the State of Maryland, and/or

in their respective State (Again Here the State of Maryland) by the events described in this

Complaint for Relief and/or as attached.


### 90.  NOTICE OF INTENT TO REQUEST A CLASS OR CLASSES OF NAMED CLASS REPRESENTATIVES:

Approximately one named class representative is expected to be selected to

represent each political subdivision of the State of Maryland, and similarly, for each state,

to act for themselves and a class (or classes) of all other citizens of every qualified vested

voter of Maryland and all other persons, in Districts across the Country, similarly situated,

as a F. R. Civ. P. Rule 23, class and/or, Alternatively an Opt-In collective action, or both.

**91.  THE CLASS(ES) OF PLAINTIFFS:**

This case is a Federal Claim's Multi-District RICO Federal Rule of Civil

Procedure, Rule 23, Class Action.  Also, alternatively, a Collective Action by a large class

group, or alternatively a Opt-In collective action Citizen/Voters.

## XV.  CLASS DEFINITION

The class consists of each damaged or injured Citizen Registered Voter.
Each eligible member of the putative class who has had his/her liberty and voting right
either abrogated or diverted or excised.  Each class member who was thereby denied a
fair/and/or honest vote, whether or not he/she attempted to exercise that vote, in the past
election (of 2020), and/or shall, if no intervention and relief by this Court occurs, be
denied of their fair and correct vote and resulting denial of property and freedom
guaranteed by the Federal Constitution, by similar nefarious means in the next scheduled
Federal Election, and/or thereafter.

## XVI.  MOTION FOR A TEMPORARY RESTRAINING ORDER

**A.**  Plaintiffs Hereby Request an Extraordinary Forthwith Emergency

Temporary Restraining Order to Require, Permanent Preservation of Evidence of the

Ballots, Envelopes and All Related Election Records, Both Financial and Operative,

Related to the Presidential Election of 2020, under Penalties of a Finding of Violation of

Felony Spoilation of Federal Election Materials:

Without a forthwith Protective Order, reminding Defendants of the duty to

preserve evidence, coupled with extension of the currently effective evidence preservation

date of September 3, 2022 will undoubtedly result in destruction of evidence, with

irrevocable and irrecoverable harm.  The evidence of malfunctions will be forever lost from recovery.  Accordingly the preservation Order included in a Temporary Restraining Order should issue, postponing destruction of all election materials pending further Order of Count.

**B.**  Linked to the preservation of evidence, and considering the great benefits of additional, easily obtainable evidence Plaintiffs Request Permission immediately upon service of process, to Issue 3 to 6  Subpoenas for Documents and Two Rule 30(b)(6) deposition notices for each County or voting jurisdiction in Maryland.

**C.**  This Request for Documentary Evidence Production via Subpoena, and 30(b)(6) testimony supporting document production information, is Intended to Produce Documents and Testimony which shall, be presented at the Initial Hearing on a Preliminary Injunction, produce overwhelming and definitive proof of the actual facts  and magnitude, in each of these 21 counties voting jurisdiction im Maryland resulting in the massive election fraud which, now, has become impossible to deny existed.  The use of the subpoena power of the Court will greatly simplify and clarify the Injunction presentation clarify the interests of truth and justice.

**D.**  A draft Temporary Restraining Order is Attached as per F. R. Civ. P. Rule 65(b)(A).  In the event this Order is not Granted, all election materials, including Envelopes and Ballots, and financial records are subject to destruction, pursuant to 52 U.S.C. § 20,701.

Undersigned Counsel certifies pursuant to F. R. Civ. P. Rule 65 (b)(B) that in several of the voting jurisdictions, repeated request by Plaintiffs utilizing normal informal and PIA methods have elicited oral or non responsive answers, strongly indicating that preservation method are already being violated, or never existed in the first instance.  Therefore further destruction of key evidence is likely and expected to occur without, or even in spite of a Temporary Restraining Order.

For this reason a TRO should be issued with the normal expiration date of 14 days, subject to renewal as per Rule 65.  A draft Order is Attached as Exhibit A.

## XVII.  CONCLUSION

For all of the above reasons the accompanying draft Temporary Restraining Order for 14 days, renewable as needed to extend the statutory destruction date for Eletion materials and financial records of September 3, 2022, renewable upon application, should be granted.   Further permission for the issuance of 5 Notices of F. R. Civ. P.30(b)(6) depositions is granted.  Attachment A is a draft Temporary Restraining Order.

As to the accompanying request for permission to take several Rule 30(b)(6) depositions, the Court should limit quashing of production of materials requested, incident to reasonable, substantial and material reasons move to quash any Notice of Deposition upon a demonstration of substantial burdensomeness or other just cause shown.

Because of the complexity of the alleged frauds, Plaintiffs expect to detail

the preparation of a proposed draft of the Preliminary Injunction is respectfully reserved until after the evidentiary heating on the Injunction itself, or as combined with a trial on the merits.

## XVIII.  VERIFICATION

I, Lewis T. Porter, am a named plaintiff in this case, and I am over the age of 18, a Citizen of the State of Maryland, and otherwise qualified to testify before this Court; I hereby swear under the penalties of perjury that all of the facts appearing herein, and as attached to this Complaint and Requests for Injunctive relief are true and correct as stated and each evidentiary attachment hereto is a genuine document to the best of my current, knowledge, information and belief.

Respectfully submitted,

*Lewis T. Porter*, Electronic Signature, Plaintiff/ Investigator, Secretary 20-20 Watch

Lewis T. Porter,  June 28, 2022

Respectfully submitted,

*Walter T. Charlton*, Electronic Signature, June 28, 2022

Walter T. Charlton, Esq.,
 DC Bar # 186940,
Maryland United States District Court Bar # 07638
Walter T. Charlton & Associates, CPA/Attorney
11213 Angus Way, Woodsboro, Maryland 21798
Telephone, 410 571 8764, email, charltonwt @ comcast.net
Post Office Box # 370, Woodsboro, Maryland 21798

# INDEX OF ATTACHMENTS

Attachment A- Draft Temporary Restraining Order.........................................

Motion for a Temporary Restraining Order, Preliminary Injunction and
        Permanent Injunctive Relief...................................................................

Exhibit # 1     Grants to 21 Maryland Counties and Baltimore City, ... $ 6, 245,797.

Exhibit # 2 .1 Declaration of Eye-Witness to Ballot Stuffing, Lois Ann Gibson.

Exhibit # 2..2 Declaration of Two Witnesses, Names Redacted.........................

Exhibit # 3     Declaration of Newly Non-Resident, Kurt Kolb, regarding
                    Automated Voter Harvesting, ...............................................
Exhibit # 4     Frederick and Carroll County Grant Contracts, with Terms ...........

Exhibit # 5     Howard County, List of Payments of Exact Money Dollars
                Received in Grants from Chicago Charity,
                Center for :Tech and Civic Life, (CTCL) $ 688,226, distributed
                in Same Amount, $ 688,226, to List of about 730 Named Persons
                also Furnished from disbursement Records of Howard County ................